39 C.C.P.A. (Patents)

**SIMPSON et al. v. NERACHER et al.**

**SIMPSON et al. v. PATTERSON et al.**

**SIMPSON et al. v. MAURER.**

**MAURER v. SIMPSON et al.**

**Patent Appeal Nos. 5793–5796.**

United States Court of Customs and Patent Appeals.

June 26, 1951.

Rehearing Denied in Nos. 5793 and 5795, Sept. 28, 1951.

Benton Baker, Chicago, Ill. (Edward C. Gritzbaugh, Chicago, Ill., of counsel), for Simpson and others.

Sidney A. Ochs, Detroit, Mich. (Charles M. Thomas, Washington, D. C., of counsel), for appellees Neracher and others, and Maurer.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

GARRETT, Chief Judge.

These are interference cases relating to power transmission systems for motor vehicles which, because of the similarity in subject matter and the identity of the respective assignees, were heard together by the Board of Interference Examiners of the United States Patent Office.

From the three decisions of the board, separately rendered, appeals were taken to this court, appeal No. 5796 being in the nature of a cross-appeal.

By stipulation of counsel for the respective parties in interest, a consolidated transcript of the record was presented with the appeals to us.

It appears that Borg-Warner Corporation, of Chicago, Illinois, is the assignee of the three Simpson et al. applications and Chrysler Corporation, of Detroit, Michigan, is the common assignee of the adversary applications.

Separate briefs and oral arguments were presented before us by counsel for the respective parties, and in the last two cases involving the cross-appeal separate briefs were filed and separate arguments were heard.

The application of Simpson et al. is entitled "Automatic Transmission and Control System Therefor"; that of Neracher et al. "Power Transmission"; and that of Maurer "Power Transmission."

While, as has been indicated, there is a broad resemblance of subject matter, the issues require separate decisions.

Appeal No. 5793, Interference
No. 81,090.

This interference relates to a mechanism for power transmission in motor vehicles, wherein a countershaft transmission works into a planetary transmission and a system is provided for controlling the shifts between the two positions incident to both of the respective power transmission units.

The interference was originally declared August 26, 1943, between the application of Simpson et al., filed July 19, 1941, and that of Neracher et al., filed January 16, 1941. As then declared, it embraced two counts, but after various proceedings in the Patent Office, which need not be recited in detail, the interference was reformed and redeclared on December 16, 1946, with only a single count which reads: "1. A variable speed transmission comprising a countershaft type unit and a planetary type unit in tandem, each of said units providing a first and a second ratio, means for effecting shifts from one ratio to another in the countershaft type unit, means for effecting shifts from one ratio to another in the planetary unit, said first ratios of said units being combinable to produce a low transmission speed, said first ratio of the countershaft unit being combinable with said second ratio of the planetary unit to produce an intermediate transmission speed, said second ratio of the countershaft unit being combinable with said first ratio of the planetary unit to produce a higher intermediate transmission speed, said second ratios of the two units being combinable to produce a high transmission speed, and means for automatically operating the two said shifting means to effect shifts from the low speed to the high speed through alternatively either of the intermediate speeds, governor means for controlling the operating means, and manual means for controlling the effectiveness of the governor."

We follow the example of the Board of Interference Examiners and hereinafter usually refer to Simpson et al. as Simpson and Neracher et al. as Neracher.

The count corresponds to claim 44 of the Simpson application and to claim 95 of Neracher. Simpson was in a position to and did oppose the action of the Primary Examiner in making the claim a count in the interference, insisting that Neracher did not disclose the subject matter, but the Primary Examiner overruled the insistence, and adhered to his position in a second decision rendered upon request for reconsideration.

Normally, it was incumbent upon Simpson as the junior party to establish priority by a preponderance of the evidence, but all the dates alleged by him in his preliminary statement were subsequent to the filing date of the application of Neracher and, therefore, he was placed under

order to show cause why judgment should not be entered against him upon the record. He responded with a motion to dissolve the interference on the ground that Neracher had no right to make the count. That, which is ancillary to priority, was the sole question before the Board of Interference Examiners and is the sole question before us.

The devices of the respective parties as entireties are quite complicated. The application of Simpson contains 11 sheets of drawings embracing twenty-four figures, two of which figures were amended after the application had been filed, and the application of Neracher has thirteen sheets of drawings embracing thirty-eight figures. In both the numerals indicating particular parts are very numerous, and we have experienced some difficulty in visualizing the mechanism.

As stated in the brief for Neracher, the fact question presented by the appeal "involves Neracher's right to make an issue count directed to an automatic transmission comprising correlated mechanical and hydraulic structures with complex electrical circuit controls * * *."

In the brief for Simpson it is said:

"The subject-matter in interference relates to variable speed transmissions, that is, in the case of an automobile, that part of the mechanism through which changes in speed of the vehicle are effected. While in this case the transmission is called automatic, actually it is semi-automatic. This is so because a manual operation is necessary. This is an operation of what is commonly known as accelerator pedal or throttle control.

"The Simpson application, in which the interference count originated, discloses a transmission, which is interposed between a driving or input shaft (the shaft which is driven from the engine of the automobile) and a driven or output shaft (the shaft from which the rear wheels of the automobile are driven). This transmission * * includes two units, one a countershaft unit; the other a planetary unit. These units are arranged in tandem, that is, one ahead of the other.

"The arrangement is such that five forward speed ratios can be obtained, (1) low, (2) second, (3) second overdrive, (4) direct, (5) direct overdrive. There is also a reverse speed ratio, but that is not involved here. Low, second, and direct are provided in the countershaft unit; direct and overdrive are provided in the planetary unit. The overdrive speed ratios differ from the others chiefly in that the output speed is faster than the input speed; the direct ratio being 1–1, and low and second (underdrive) ratios, less than that."

The brief then describes, in great detail and with the use of many numerals to designate parts, the manner in which the different forward speed ratios can be obtained. This need not be repeated *in extenso*.

The low speed ratio is not mentioned in the count. The brief states that it and the second speed ratio are obtained by a manual operation or hand shifting of gears in the countershaft unit, and, according to the brief: " * * * the other speed ratios are obtained by power operations as the result of the operation of certain switches by a governor responsive to the speed of the vehicle, at the will of the operator upon manipulation of an accelerator pedal or foot throttle control."

The following is taken from the decision of the board:

" * * * the device covered by the count is a transmission gearing for automotive vehicles consisting of two types of change gearing in tandem whereby several combinations yielding a plurality of overall gear ratios is available.

"The invention, however, goes beyond merely providing two gear boxes with a shifting lever for each. The real purpose of the invention is to provide a power operated shifting arrangement under the control of the operator but requiring during as much of the normal continuous forward driving of the vehicle as possible only manipulation of the accelerator pedal, thus freeing the other limbs of the operator from engaging in manipulative activities to produce the required shift of gears. An objective, therefore, is to avoid using a hand

lever to shift gears during this phase of driving. To this end power devices are provided to move the shiftable elements of the gear units and these power devices are controlled as to whether any one of them may act by devices responsive to the speed of the vehicle so that, in general, the gear ratio called into action will be suitable to the speed. However, in order that the operator may select alternative intermediate gear ratios and to have some control over the time of making some of the shifts, the accelerator pedal is related electrically to the control system (as also is a clutch pedal in Neracher), and mechanically to the control and shifting devices by taking into account its normal effect on the motor speed, so that the operator may dominate or suppress the primary, or speed responsive controls and impress his choice upon the machine. This much is clearly common to the disclosures of both parties. The manner in which it is accomplished by the parties differs in considerable amount of detail. In order to understand precisely how it is accomplished requires carefully following out this detail. This we have done."

The board also said, in substance, that the first part of the count, reciting the two types of gear ratio shifting units for both the countershaft and planetary units together with means for effecting the shifts in each of the units, was not in question and that the basis of the dispute resides in the last clause of the count which it quotes and which we repeat: " * * * and means for automatically operating the two said shifting means to effect shifts from the low speed to the high speed through alternatively either of the intermediate speeds, governor means for controlling the operating means, and manual means for controlling the effectiveness of the governor."

With respect to the clause so quoted, the board expressed the view that:

" * * * [it] was apparently designed to cover mechanism by which shifts from the lowest speed of the combined units to the highest speed of the combined units may be made to take place under power actuation but at the selection of the operator

through either of two possible intermediate gear ratios.

"Although as we have stated the systems of the two parties differ in quite a number of details they have in common that the mechanical movement of the change in gearing is power actuated, that the power actuating elements are conditioned for operation by mechanism responsive to the speed of the vehicle (of the fly-ball governor type in both applications) and that the actual operation of the shiftable elements is tied in with the operation of the accelerator pedal by means of a switch or switches, so that the selection of the time and manner of shift is, within predetermined speed ranges, under control of the operator of the vehicle."

No error is assigned in the reasons of appeal as to the board's holding respecting the first part of the count.

The specific contentions before us on behalf of Simpson are, as they were before the board:

"[a] That Neracher's disclosure does not include means for operating the 'two said shifting means to effect shifts from the low speed to the high speed through alternatively either of the intermediate speeds', as defined in the count.

"[b] That Neracher's disclosure does not include 'governor means for controlling the operating means', as defined in the count.

"[c] That Neracher's disclosure does not include 'manual means for controlling the effectiveness of the governor', as defined in the count."

It is observed that all these elements are required by the last clause of the count, supra.

In its opinion the board directed attention to its decision, which was affirmed by us, in the case of Osborne v. Patterson, 169 F.2d 817, 819, 36 C.C.P.A.,Patents, 719, wherein there was involved subject matter similar in many respects to that here involved. The parties in interest there were the same as those here; viz., Borg-Warner Corporation and Chrysler Corporation, and as stated by the board "the same type of claim terminology raising the same problem of

interpretation is involved, and some of the same arguments urged there are again urged in connection with the issue here."

In our decision in that case we gave the following description of the subject matter based upon the particular count there analyzed: "[The] count defines a transmission structure comprising a combination of a countershaft type transmission with two forward speeds. Those transmissions are conventional and well known in the automotive art. The novelty which is said to be here involved is in the providing of mechanism to make possible and to effectuate the bringing into operation of sequences of combinations of the transmission's speed or gear positions in the ordinary operation of the structure. The novel parts of the combination in the structure are recited in the count as 'automatically controlled means' and a 'manually operated overcontrol means.' The automatically controlled means is made effective by being responsive to conditions obtaining in the structure, and the manually operated overcontrol means is such that it will supersede the automatically controlled means by manual operation."

In the decision in the instant case the board followed the interpretation placed upon the counts in that case insofar as such interpretation is here pertinent, and there is no specific *assignment of error* covering the action of the board in the reasons of appeal. The *brief* for Simpson does dwell at some length upon certain differences in structure between the Simpson and Neracher devices—an important phase of the controversy upon which we hereinafter comment.

Practically the only interpretation made by the board in its consideration of the three specific contentions on behalf of Simpson hereinbefore recited related to the term "automatically," with which the board said it was confronted at the outset. It said *inter alia:* " * * * The adverb 'automatically' derives from the adjective 'automatic' which etymologically and in *original* [italics ours] usage meant a device or thing which was responsive to certain changes in conditions and reacted in accordance therewith to produce or exhibit certain motions. The words therefore implied both *self-sensing and self-moving.*" (Italics quoted.)

The board then recited, upon the authority of different lexicographers, including Webster's New International Dictionary, Second Edition, that "automatic" has come to have a much broader meaning than that attaching to it in its earlier usage, and, after citing Ex parte Rhoades, 1923 C.D. 129, states that it is usual ex parte practice to ignore the word "when it occurs in a means clause and to evaluate the claim as if it were not there." The board expressed the view that the examiner did that in the instant case, and thereafter, saying, in substance, that the words "automatic" and "automatically" appear to be used in both the restricted and the broad sense by both contestants here, declared:

"If we are compelled to give a meaning to the word, it is our view that it should be read as 'automotive.' In this reading, or even if the word be ignored, the concluding clauses would quite logically divide the controlling and actuating elements into those which furnished the power for the shift, under the clause 'means for automatically operating * * *'; those for sensing the speed condition under the clause 'governor means * * *'; and those for enabling the operator to exercise control under the clause 'manual means * * *' The first of these clauses reads upon the Neracher device, which has separate two position fluid pressure motors for each of the two change gear units. The change of position of one such motor while the other remains inactive produces one or the other of the two intermediate overall gear ratios. Simultaneous shift by the two motors is not contemplated and does not appear to be possible. The control apparatus does, however, provide for the selection of either of the intermediate gear ratios. This is accomplished either in the shiftup or shiftdown by operation of the accelerator pedal to actuate a snap switch associated with it, which has for its purpose the substitution of the combination of 'direct' drive in the countershaft unit with 'direct' drive in the planetary unit, referred to as 'overall di-

rect', as intermediate speed in place of 'second' in the countershaft unit and 'overdrive' in the planetary unit, referred to as 'overdrive-second.' Although this alternative is explicitly mentioned by Neracher only with respect to downshifting, it is clear that it is inherently operative also in upshifting as recited in this clause. The selection of alternatives is not wholly at the caprice of the operator it is true, because of limitations imposed by the speed responsive system. This, however, is also true of Simpson's device."

The correctness of the board's interpretation of the terms "automatic" and "automatically" is not challenged by any specific assignment of error. If Simpson's assignee believed it to be erroneous, we assume that it would have been challenged specifically and directly by such an assignment and that reasons would have been given as to why it was deemed erroneous. As we view it, the interpretation so made is, in a sense, basic to applying to Neracher that feature of the count reading "means for automatically operating the two said shifting means to effect shifts from the low speed to the high speed through alternatively either of the two intermediate speeds." Under the interpretation given, it seems clear that no error in applying it was made by the board.

With respect to that feature in the last clause of the count reading "governor means for controlling the operating means," it appears to be the position taken on behalf of Simpson that it must be read in connection with the succeeding provision for "manual means for controlling the effectiveness of the governor" and that when the two are considered together it is meant that "the 'governor means' is limited to a single governor; otherwise, the expression 'the governor' would be inapt." This argument is made in connection with the contention that the count should be interpreted and applied in the light of the disclosure of the Simpson application where it originated, it being stated that Simpson discloses but one governor.

■ A question similar in principle was involved before us in the case of Osborne v. Patterson, supra, and we there said:

"* * * It has been held many times in this and other courts that a means for performing any function includes all of the elements contributing to such performance, regardless as to the number or kind of such elements."

We there cited Mantz v. Kronmiller, 168 F.2d 100, 35 C.C.P.A., Patents, 1189.

It is contended on behalf of Simpson that the instant controversy relates to means different in purpose from the means involved in the Osborne v. Patterson case, supra. That may be true, but, as we view it, the principle involved is the same in both cases.

With respect to the contention that the count should be interpreted in the light of the Simpson disclosure the position taken on Simpson's behalf impresses us as being somewhat illogical in that it is said in the brief: "While the count under consideration, on its face, is not ambiguous but clear and concise, when interpreted as the Primary Examiner and the Board have interpreted it, it plainly becomes ambiguous."

■ The interpretation by the board recited supra related only to the meaning of the words "automatic" and "automatically." That interpretation, we may repeat, was not challenged by an assignment of error. There was no challenge of the board's holding to the effect that both Simpson and Neracher used the terms in their respective applications in both a restricted sense and a broad sense. We fail to discern how stating the meaning of a term in phraseology as to which there is no apparent disagreement renders ambiguous a count normally "clear and concise." Of course, in the absence of ambiguity, the rule is that the terms of a count are given the broadest interpretation of which they reasonably are capable. In practice, this rule seldom is departed from except in some cases where a patent is involved in the interference.

The third and last element of the final clause of the count, as has been stated, is couched in the phraseology "manual means for controlling the effectiveness of the governor." The board, evidently drawing

upon Simpson's specification, or upon the view of the Primary Examiner, says that this: " * * * relates to the interaction of the foot pedal through associated switching mechanism and though its effect on the relative motor speed to enable the operator to overcontrol the speed responsive system and determine the selection of the shift."

It held the element to be "clearly supported by Neracher."

This holding is challenged vigorously by Simpson, but the challenge is predicated upon limitations not present in the count. That Neracher discloses means which performs the function defined virtually is conceded but it is not the same type of means as that upon which Simpson is asserted to rely.

Another of the several allegations in the brief for Simpson is that "the board improperly applied the doctrine of inherent disclosure." It is said by way of arguing this point that the board "has gone so far as virtually to reconstruct the structure of the Neracher application and improvise its operation, in the light of Simpson's disclosure."

The only reference we find to inherency in the decision of the board is in that portion hereinbefore quoted relating to the upshifting of the accelerator pedal "to actuate a snap switch associated with it."

We do not find any challenge on the part of Simpson of the accuracy of that statement and we do not regard the decisions cited in the argument upon this point pertinent to the facts of this case.

It appears to us that reconstruction of the count is sought on behalf of Simpson rather than on behalf of Neracher.

■ It seems obvious to us that here an effort is made to have us substitute a count for the count which actually is involved and test Neracher's right by the substituted count rather than by the actual one. In any event, as we view the case, the contentions on Simpson's behalf could be sustained only by reading into the count a number of specific limitations which he did not see fit to express therein. This we may not do. No citation of authority for this familiar legal principle is necessary.

Simpson by his claim 44, to which the count corresponds, sought to obtain, as was his privilege, an extremely broad patent monopoly. The word "means" appears five times in the count and nowhere is it limited to any particular kind or type of mechanism. To determine the type, recourse must be had to his specification, and it is the claim, not the specification, which constitutes the measure of his invention. He was within his legal rights in the quest but he took the chances of interfering with some earlier seeker after the same broad patent protection.

It may be assumed that Simpson's assignee would be entitled to claims—so far as we know, it may already have allowed claims—which embrace the limitations sought to be injected into the count before us, but, so far as the count before us is concerned, we agree that it is readable on the Neracher device because of its breadth.

■ Numerous authorities are cited in the brief for Simpson, some of which, if not all, would be in point if we had before us a count with limitations such as those we, in effect, are asked to read into the one which is before us, but as to that one they have no application and it is unnecessary to lengthen this opinion by discussing such authorities.

The decision of the Board of Interference Examiners in Appeal No. 5793, Interference No. 81,090, is affirmed.

Affirmed.

### Appeal No. 5794, Interference No. 82,596.

The pattern of this interference is quite similar to that of interference No. 81,090, supra. The appellants are the same and the respective assignees are the same.

It relates to a power transmission system for motor vehicles described in the two counts involved which are quoted, infra.

The interference was declared on the same date as the redeclaration of interference No. 81,090, supra—December 16, 1946—between the same application of Simpson et al., serial No. 403,196, involved

424

in that interference, and an application of Patterson et al., serial No. 360,068.

The Patterson et al. application, of which Chrysler Corporation is the assignee, was filed October·7, 1940. That of Simpson et al., of which Borg-Warner Corporation is the assignee, was filed July 19, 1941. So, the Simpson et al. application is the junior application.

It is unnecessary to detail at this point the various activities in the Patent Office prior to the decision of the Board of Interference Examiners from which the appeal comes to us. It is sufficient to say that Simpson et al. resisted the inclusion of the claims in the interference; that their opposition was overruled by the Primary Examiner; that in the preliminary statement of Simpson et al. no dates prior to the filing date of Patterson et al. were alleged; that Simpson et al. were given notice that judgment on the record would be entered against them unless good and sufficient cause should be shown why such action should not be taken; that Simpson et al. thereupon moved to dissolve the interference on the ground that Patterson et al. could not make the counts; and that action followed whereby judgment was withheld pending the decision of the Board of Interference Examiners, which was rendered October 14, 1949, holding that Patterson et al. could make the counts and awarding them priority.

Before us, as was the situation before the board, the sole question involved is that of the right of Patterson et al. to make the counts.

Hereinafter, conforming to action of the board, we usually refer to the nominal appellants, Simpson et al., as Simpson, and to the nominal appellees, Patterson et al., as Patterson.

In declaring the interference the Primary Examiner stated that count 1 relates to count 50 of Patterson and to count 29 of Simpson and that count 2 relates to count 57 of Patterson and to count 16 of Simpson. The interference seems to have been sought by the assignee, Chrysler Corporation, on the basis of the Patterson application.

Specific allegations of Simpson are that Patterson's disclosure does not include the last two means defined in each of the counts, and we here reproduce the counts with the controversial matter italicized:

"*Count 1.* A transmission comprising input and output shafts, an intermediate shaft, connections between the intermediate shaft and the other shafts, said connections including a pair of overrunning clutches, other connections between the intermediate shaft and the input and output shafts, one of said connections comprising a jaw clutch and another including a pawl and a slotted member engageable therewith, *means for simultaneously conditioning the jaw clutch and pawl for operation, and means for delaying the operation of the jaw clutch* to enable the operator selectively to control the establishing of said connections, said intermediate shaft being substantially disconnected at such time from the input and output shafts by reason of the overrunning clutches, thereby making possible the immediate operation of the pawl.

"*Count 2.* A transmission comprising input and output shafts, a plurality of gear trains connectible between the shafts to provide different speed ratios therebetween, positive means for establishing the gear trains, *means for simultaneously conditioning at least two of said positive means for operation and means rendering one of said positive means slower in operation than the other,* whereby to enable the operator selectively to control the establishing of the gear trains."

It is obivious that if Simpson's contention that Patterson does not disclose means called for in the italicized phraseology the decision of the board must be reversed, but it must be distinctly understood that it is not required that the kinds or types of means called for be the same as the kinds or types disclosed by Simpson.

One of the allegations in the brief for Simpson is that "The Patterson disclosure does not respond to the express limitations of the counts." The fact, of course, is that Simpson uses the broad term "means" with no limitations as to kinds or types of means.

In other words, there are no limitations respecting the means in the expressions "means for simultaneously conditioning the jaw clutch and pawl for operation," "means for delaying the operation of the jaw clutch," "means for simultaneously conditioning at least two of said positive means for operation," and "means rendering one of said positive means slower in operation than the other."

It follows that any disclosed means which will perform the defined functions ordinarily is sufficient to meet the requirement of the patent laws.

Here, as in interference No. 81,090, supra, Simpson seeks broad patent protection and takes the risk of being interfered with by a prior seeker. The question is presented, however, as to whether the factual situation here is on all fours with the factual situation in that interference.

In considering this factual question we, of course, have had in mind certain thoroughly established principles of law and practice governing the determination of priority in interference proceedings, such as: (a) the counts normally [1] are given the broadest interpretation of which they reasonably are capable; (b) limitations clearly expressed in counts may not be disregarded; (c) where only applications are involved, the burden rests upon a junior party to establish priority, including matters ancillary thereto, by a preponderance of evidence [2]; (d) concurring decisions by the tribunals of the Patent Office, when clear and unambiguous, particularly in cases involving highly technical questions of fact, will not be disturbed by the courts except upon a clear showing of error; and (e) the burden rests upon a party appealing to convince the courts of error.

The record in this case does not disclose any analysis by the Primary Examiner of the two counts here involved, nor do we find where he definitely points out the fea-

tures or elements disclosed by Patterson which he regarded as being the means which Simpson alleges Patterson does not disclose.

The counts were placed in interference upon a motion made by Chrysler Corporation, assignee of Patterson, after access had been had to the various claims by both parties. The assignee of Simpson, therefore, was in a position to oppose the introduction of the counts *ab initio* and did so.

In seeking to bring claims of the Simpson application into interference the motion of Patterson's assignee, Chrysler Corporation, designated proposed counts by letter rather than by number. Claim 29 of Simpson which became count 1 was proposed as count V and claim 16 of Simpson which became count 2 was proposed as count I.

Before passing upon the claim proposed as count V the Primary Examiner, in a decision rendered February 28, 1946, analyzed claims proposed respectively as counts T and U, apparently relating to a somewhat similar element as V, and denied the motion to include them. He then granted the motion to include V, saying only it "is broader with respect to the 'means for delaying the operation of the jaw clutch' and is considered proper subject matter for interference."

As to the claim proposed as count I which became count 2, the Primary Examiner said merely "Proposed count I appears properly supported by the disclosure of Patterson, and hence, constitutes proper subject matter for interference."

In a petition for reconsideration, Simpson, respecting proposed count V (which became count 1), said: "The Examiner appears to be in error in considering the breadth of the expression 'means for delaying the operation of the jaw clutch' contained in the proposed count V as justify-

---

1. When a count is ambiguous, particularly when it is taken from an issued patent, it is proper to give it the definite meaning attributed to it where it originated.

2. In cases involving interference with a patent, issued prior to the filing date of the application involved, the facts to establish priority must be shown beyond a reasonable doubt. That question, of course, is not in the instant case.

ing the granting of the motion as to that proposed count. The objections stated as to proposed count T and recognized by the Examiner as requiring the denial of the motion as to that proposed count appear to be equally applicable to proposed count V when considered in the light of the disclosures of the respective parties."

To this the Primary Examiner responded: "* * * the original objections mentioned by the party Simpson et al. were considered at the time the Decision of the Examiner, dated February 28, 1946, was rendered and since such decision is not obviously in error no reason is seen for altering such decision now."

With respect to proposed count I (which became count 2) it was argued on behalf of Simpson: "It is not understood how the disclosure of Patterson et al. can be held properly to support proposed count I, which properly was held in sub-division II and III to be not readable on the disclosures of Maurer, and Neracher et al. In the absence of any correlation of the means for operating or controlling the operation of the means for effecting shifts to establish the connections between the shafts and the provision of two overrunning clutches with a resulting floating condition of an intermediate shaft, precluding any predetermination of the engagement of the connecting means of the clutches in relation to one another, it is not understood how either the 'means for simultaneously conditioning at least two of said positive means for operation', or the 'means rendering one of said positive means slower in operation than the other' of the proposed count can be applied to the disclosure of Patterson."

In answer the Primary Examiner said: * * * the original objections mentioned by the party Simpson et al. were considered at the time the Decision of the Examiner, dated February 28, 1946, was rendered and since such decision is not obviously in error no reason is seen for altering such decision now. The fact that this count was held not readable on the disclosures of two other applications does not preclude its readability on the Patterson et al. application. The limitations discussed by the party

Simpson et al. are not present in the count which is still believed to be properly readable on Patterson et al.

The argument on behalf of Simpson relating to the count not being readable on other disclosures does not appear to have been pressed before the board, nor was it made before us.

The foregoing is all that we find in the record from the Primary Examiner respecting Patterson's showing. What he thought of the matter is made entirely clear, but it is of no particular aid in identifying the pertinent features of the Patterson disclosure.

The discussion of the matter by the board is quite extensive and the briefs on behalf of the respective parties are replete with explanations of the operation of different parts of the respective systems.

In the briefs on behalf of both parties much space is devoted to a description of the manner in which Simpson's different parts function and to comparing the operation of certain of the Patterson features with the operation of Simpson's features. The brief for Patterson alleges numerous errors, mistakes, and inaccurate statements in the Simpson brief, the principal contention being that here, as in interference No. 81,090, supra, Simpson's contention cannot be sustained except by reading into the count limitations as to elements which are not expressed therein.

The discussions so detailed are informative although somewhat prolix and repetitive, but we feel that it is unnecessary to follow them seriatim and attempt minute technical explanations of an admittedly complex mechanism. The count involved is broad and the ends of justice are met fully by dealing with it broadly. That is the course which was pursued by the Board of Interference Examiners, the tribunal whose decision we are called upon to review.

The board stated that both parties show a countershaft underdrive gearing working into a planetary overdrive gearing; that each gearing unit may be shifted into a direct drive mechanically independently of the other gearing unit; that each gearing

unit has an overrunning clutch, which is a frictional one way drive device, associated with its intershaft connection; that each countershaft unit is provided with a positive clutch of the so-called jaw clutch type; and that each planetary unit has a positive clutch device by which the overdrive may be rendered effective or ineffective.

Thereafter the board discussed individually the controversial clauses of the counts indicated by the italicized phraseology as hereinbefore quoted, giving such explanation of the meaning in the involved art of the words and phrases as appeared necessary to a correct understanding of the counts. The discussion is cogent and well connected and we quote it verbatim:

"Count 1, up to the first means clause, is a catalog of transmission parts, rather sketchily associated, but which are all readily found in Patterson as required by the counts.

"The first means calls for something for 'simultaneously conditioning' the jaw clutch and the pawl (of the pawl and slot clutch) for operation. 'Conditioning' for operation means performing preliminary steps requisite for operation without performing the final step upon which the action takes place. 'Simultaneously' means here that a state of being conditioned is brought into existence with respect to each clutch which subsists contemporaneously until one or the other is operated. It does not mean that the steps of conditioning the clutches are synchronized, a possible alternative meaning of the bare language, since it is not supported in this sense in either of the parties' applications. This is because in each of the devices a condition for the operation of the jaw clutch is the functioning of a speed responsive device at one speed and a condition for operation of the pawl and slot device is the functioning of a speed responsive means at another speed. Since a vehicle cannot move at two different speeds at the same time, these two conditions may not be established at the same instant.

"A vehicle having the Patterson transmission may be driven to a speed of 25 m. p. h. with the kickdown switch 265, operated by the accelerator pedal, closed. This switch completes a circuit through one of two solenoids either of which holds the jaw clutch shifting motor against operation. The other solenoid is disconnected at speeds above 5 m. p. h. by operation of governor 275 and governor switch, so that shifting of the jaw clutch awaits only reopening of the kickdown switch by pedal manipulation by the operator. At 25 m. p. h. the centrifugal force has brought the bar pawls of the centrifugal clutch to the point where they will engage the slots upon reversal of torque. It is apparent therefore that the two clutches have been both brought by the control apparatus to a condition in which they will be actuated in response to a movement of the operator. The clause is therefore satisfied.

"The next clause requires means be present for delaying the operation of the jaw clutch so that the operator may make the selection of connection. In Patterson's device, in the condition that we have described it, the operation of the jaw clutch is delayed by the longer movement that is necessary to open the kickdown-switch upon release of the pedal to enable the operator to obtain torque reversal to complete the engagement of the centrifugal bar pawl and slot clutch. It is thus that the operator may obtain overdrive without a shift in the underdrive unit. It is our opinion that the requirements of this clause are met by the Patterson device. While it may have been that Simpson may have had in mind a deliberately timed movement by the operator to effect the discrimination in the shifting when drafting this clause, there is, in our opinion, nothing in the language of the clause or in its contextual implications which limits it to a mechanism selectively responsive to a timed movement of the operator.

"The remaining portion of the count merely states the fact that the overrunning clutches at the time of making the overdrive shift under the conditions discussed above, have the effect of 'disconnecting' the shaft intermediate the gear units in that it would not produce torque reaction in the planetary gearing which would interfere with the clutch pawls going home. Thus

to the extent that the overrunning clutches can help the action, the operation is made the more immediate. This is all true of the Patterson device as well as of the Simpson device.

"Simpson urges, however, that he has shaped his pawls to enhance grabbing and to make for immediate engagement with the slots whereas Patterson does not. But the difficulty with this argument is that the immediateness of operation is ascribed in the claim as the function of the overrunning clutches. We cannot substitute pawl shape which is not mentioned in the claim for the clutches which are therein plainly recited. Nor can we add this structure to the claim on the plea that it contributes more to the recited function than the structure which is recited as producing the function.

"Our conclusion with respect to this count is that the Primary Examiner was correct in holding that Patterson could make it. This count is broadly and loosely drawn, and it can be read upon the construction and capabilities of the device of Patterson with at least the same degree of reasonableness as upon the construction and capabilities of the device of Simpson.

"Count 2, drawn to the same aspect of the transmission devices of the parties as count 1, omits recitation of the overrunning clutches, and defines the other clutches broadly as positive means for establishing the gear trains. The count continues with means for simultaneously conditioning at least two of the positive means for operation. This count is thus far merely broader than count 1, and since count 1 is supported in Patterson as to these elements it follows that count 2 is likewise supported therein. The concluding clause calls for means for rendering one of the positive means slower than the other one. This language is somewhat closer to Simpson's idea of discriminating for purposes of selectivity solely by the timing of the same movement than that of count 1, but still does not define a structure which has such characteristics. The jaw clutch of Patterson is slower to complete its engagement than the centrifugal clutch, counting from the time the operator begins to release the accelerator pedal, at least by the time consumed in the throw of the kick-down switch and the action of the shift motor, and this is an inherent attribute of the mechanism by which selective action is possible. While the operator of the Patterson device may think, when he thinks at all about it, in terms of length of release stroke of the accelerator pedal as the manipulative discriminator of selection of these particular shifts, and the operator of the Simpson device may think in terms of time of duration of the accelerator pedal in the fully released position as the discriminating factor, we are of the opinion that the count does not make such a distinction related, as it must be, to the structure of the device and its mechanical capabilities."

■ In an early decision of this court in the case of Sweetland v. Cole, 53 F.2d 709, 711, 19 C.C.P.A., Patents, 751, 754, we stated, in substance, that in applying the rules relative to the construction of counts to the issues of a given case the meaning of limitations "must be determined by the normal meaning of the words in which such limitations are expressed, as those words are used in connection with the art involved."

■ While, as already we have said, no limitations respecting the types or kinds of means are expressed in the counts here involved, explanation of some of the terms and methods of operation are obviously required in order fully to understand the counts. After considering the board's description in the light of the extensive discussion in the briefs for the respective parties, we are not convinced of error therein, and, accordingly, the decision is affirmed.

Affirmed.

Appeal No. 5795 and Cross-Appeal No. 5796
Interference No. 82,600.

Seven counts are involved in this interference.

The Board of Interference Examiners awarded priority to Edwin R. Maurer, whose application is assigned to Chrysler Corporation, upon counts 1 to 6, inclusive, and to Simpson et al., whose application is assigned to Borg-Warner Corporation, upon

count 7. Both of the nominal parties, hereinafter usually referred to respectively as Maurer and Simpson, appealed to this court.

The application of Maurer, entitled "Power Transmission," was filed October 9, 1940; that of Simpson, entitled "Automatic Transmission and Control System Therefor," July 19, 1941. So, Simpson is the junior party.

The relation of the counts to the claims of the respective parties is stated by the Primary Examiner as follows:

| Counts | Maurer | Simpson |
|--------|--------|---------|
| 1 | 21 | 46 |
| 2 | 22 | 47 |
| 3 | 23 | 4 |
| 4 | 29 | 41 |
| 5 | 30 | 42 |
| 6 | 31 | 43 |
| 7 | 26 | 15 |

All the counts appear to have been derived from Simpson's claims. The interference was declared December 16, 1946, along with the redeclaration of interference No. 81,090, supra, upon motion of Chrysler Corporation—Maurer's assignee. It was declared over the objections of Simpson. In Simpson's preliminary statement no dates were alleged prior to the filing date of Maurer and he was placed under order to show cause why judgment should not be entered against him on the record. He responded with a motion to dissolve the interference on the ground that the disclosure of Maurer did not support the counts, or, to state it differently, on the ground that Maurer could not make the counts.

That was the only question before the board and is the only question before us.

Separate briefs were filed by both parties in connection with count 7, which was awarded to Simpson, and hereinafter it is considered separately.

Counts 1 to 6 awarded to Maurer read as follows:

"1. A variable speed transmission comprising in combination a countershaft type unit having low, second and direct drive ratios, and a planetary type unit having direct drive and overdrive ratios, means for effecting shifts between second and direct drive in the countershaft unit, means for effecting shifts between direct drive and overdrive in the planetary unit, and means for automatically controlling the two said shifting means to effect shifts from second to direct to overdrive direct, or alternatively from second to second overdrive to overdrive direct.

"2. A variable speed transmission as described in count 1, and means under the control of the operator for effecting the alternative sequence of shifts.

"3. A variable speed transmission comprising in combination a countershaft type unit having low, second and direct drive ratios, and a planetary type unit having direct drive and overdrive ratios, means for effecting shifts between second and direct drive in the countershaft unit, means for effecting shifts between direct drive and overdrive in the planetary unit, and means for automatically controlling the two said shifting means to effect upshifts from second to overdrive second to overdrive direct and downshifts from overdrive direct to overdrive second to second.

"4. A variable speed transmission comprising a countershaft type unit and a planetary type unit in tandem, each of said units providing two ratios, means for effecting shifts from one ratio to another in the countershaft type unit, means for effecting shifts from one ratio to another in the planetary unit, the ratios of said units being combinable to produce four different transmission speeds, and means for automatically operating the two said shifting means to effect shifts from the lowest speed to the highest speed through alternatively either of the intermediate speeds.

"5. A variable speed transmission comprising a countershaft type unit and a planetary type unit in tandem, each of said units providing a first and second ratio, means for effecting shifts from one ratio to another in the countershaft type unit, means for effecting shifts from one ratio to another in the planetary unit, said first ratios of said units being combinable to produce a low transmission speed, said first ratio of the countershaft unit being combinable with said second ratio of the planetary

unit to produce an intermediate transmission speed, said second ratio of the countershaft unit being combinable with said first ratio of the planetary unit to produce a higher intermediate transmission speed, said second ratios of the two units being combinable to produce a high transmission speed, and means for automatically operating the two said shifting means to effect shifts from the low speed to the high speed through alternatively either of the intermediate speeds.

"6. A variable transmission as described in count 5, and governor means for controlling the operating means for the units."

What we regard as the basic assignments of error alleged in Simpson's reasons of appeal are epitomized in the Simpson brief by asserting, in substance, (a) that Maurer's disclosure does not include means for automatically controlling the shifting means to effect shifts, as defined in counts 1, 2, and 3; (b) that it does not include means under the control of the operator for effecting the alternative sequence of shifts, as defined in count 2; (c) that it does not include means for automatically operating the two shifting means, as defined in counts 4, 5, and 6; (d) that it does not include governor means for controlling the operating means of the units, as defined in count 6, and (e) that the board erred by improperly applying the doctrine of inherent disclosure.

The board quoted count 1 as representative of all seven of the counts involved in the interference, and, as we understand its decision, that count, in effect, was made the test relative to counts 1 to 6, inclusive. In other words, if there be a reversal as to count 1 upon the grounds advanced against Maurer's right to make it, the decision as to counts 2 to 6, inclusive, properly would be reversible for the same reason. Also if the board's decision as to count 1 be sustained, it would follow that its decision as to counts 3, 4, and 5 likewise should be sustained. The latter would not necessarily be true of counts 2 and 6, however, because each of those has a feature additional to the features in the other counts which Simpson alleges Maurer does not disclose.

We think a proper approach to the consideration of the issues involved here may be presented by directing attention to Simpson's allegation that the board improperly applied the doctrine of inherent disclosure.

A similar allegation was made in both of the companion cases—i. e., Interference No. 81,090, Appeal No. 5793; and Interference No. 82,596, Appeal No. 5794—separate decisions of which accompany this decision, but it was not felt that inherency constituted a controlling factor in the board's decision of those cases.

The question arises as to whether there is a fundamental difference in that respect between those cases and this one.

It is contended on behalf of Maurer that the counts are clear and unambiguous although seven printed pages of the brief on his behalf are used to describe the elements embraced in his device and explain its operation, and as a matter of fact both the Primary Examiner and the board regarded it necessary to construe and interpret the counts and both did so. We deem them ambiguous. In fairness, it should be said that the brief for Simpson also devotes several pages to the description and explanation of his system and to argument about and analysis of Maurer's system. That the element now under discussion is disclosed by Simpson, of course, is conceded, since the claim which became the count was allowed him ex parte preceding the declaration of this interference in which it became involved.

Simpson's means for automatically controlling the two shifting means defined in the last clause of count 1, and present in the other counts, is a combination of a number of features as is the means—a centrifugal clutch—of Maurer which the board held "presents the inherent capability" of performing the same function as that of Simpson "when the device is adjusted so that the centrifugal clutch becomes conditioned for operation at a lower speed than that at which the clutch in the overdrive unit operates." The board states that the latter adjustment is one distinctly pointed out in Maurer's specification, but

it also states "that there is no explicit description by Maurer of the alternative selection of sequences."

The brief for Simpson, therefore, seems to be correct in stating: "The attempted reading [by Simpson's assignee] is based wholly on the assumption that the operation set forth is inherent in the Maurer disclosure. It is without support in the descriptive matter set forth in the Maurer application, which contains no suggestion of the operation defined in the count."

It seems to be conceded by the board that "Maurer has no single means for automatically controlling the shifting means whereas Simpson has a single governed structure to perform this function," but it held that the contention based upon this fact was disposed of in a decision by this court affirming that of the board in a case the correct style of which in our volume is Osborne (not Simpson et al. as, doubtless inadvertently, stated by the board) v. Patterson, 169 F.2d 817, 36 C.C.P.A., Patents 719, a case cited and commented upon in our decision in companion case, Interference No. 81,090, Appeal No. 5793, supra.

The situation is different here from that which existed in the Osborne v. Patterson case, supra, and in the companion case to this one, in that in those cases *two* distinct unitary elements were present and functioning in the devices of the appellees in obtaining *one* result, while here just *one* unit of Maurer seemingly will be employed in producing *two* results if he be credited with the performance by his centrifugal clutch unit of the function which Simpson's unit performs. In other words, a "double reading" of Maurer's unitary combination appears to be necessary to attribute to him disclosure of the counts.

The board says: " * * * the fact that the reading of broad-means clauses requires that some elements be included in more than one means is not a fatal defect in the determination of priority. The questions of overlapping and double inclusion of elements are in themselves not significant. While such overlapping may be regarded *ex parte* in certain cases as rendering the claim indefinite under the re-

quirements of Revised Statute Sec. 4888, there is no absolute rule against it, and if the various clauses of a claim are found in the disclosure in the application of a party to an interference in the relationships necessarily required by the context of the count, it will be held that he has sufficient support therefor."

It does not seem to us that one is entitled to make counts which, as claims, would be rejected in an application for lack of definiteness under R.S. 4888, 35 U. S.C.A. § 33, and thereby take such counts admittedly allowable to another applicant from that applicant.

In view of our conclusion upon the matter of the applicability of the inherency doctrine, it is unnecessary to our decision that the limitations in counts 2 and 6 be dwelt upon, but it may be said that we are not convinced that Maurer makes sufficient disclosures of those limitations.

For the reasons indicated the decision of the Board of Interference Examiners awarding priority to Maurer upon counts 1 to 6, inclusive, is reversed.

Reversed

**Count Seven of Interference No. 82,600.**

This count was introduced into the interference upon motion of Chrysler Corporation along with counts 1 to 6, inclusive, supra. As to it the Board of Interference Examiners awarded priority to the joint inventors Simpson and Carnagua, whose application stands assigned to Borg-Warner Corporation. Cross-appeal for Maurer thereupon was taken to this court.

The count reads: "7. A transmission comprising input and output shafts, a plurality of means for establishing different ratios between the shafts, and means for simultaneously conditioning at least two of said first means for operation, said two means being different, one of said two means being inherently faster in operation than the other, whereby to enable the operator selectively to control the ratio establishing means."

It is said in the decision of the board that the Primary Examiner (in his first action on the motion to include the claim

as a count of the interference) held that Maurer could not make the count because one of the shifting devices is not inherently faster than the other, as is required by the last clause of the count reading: "* * * one of said two means being inherently faster in operation than the other, whereby to enable the operator selectively to control the ratio establishing means."

In a decision rendered upon a request for reconsideration, however, the Primary Examiner changed his view and held that Maurer could make the count.

In its decision the board pointed out that "Maurer does not design his apparatus to take advantage of a time-of-operation characteristic in order to make a selection at a time when the two devices are simultaneously conditioned," and that the device of Maurer is not arranged to make use of the time characteristic in connection with the operator's movements at the time he makes the selection. It said further: "* * * It is our opinion that the whereby clause must be given effect; that a fair reading of it means that the elements of the device which the operator moves to make a selection must utilize in some way the difference in speed of operation of the shifting mechanisms. For this reason we think the Primary Examiner was in error when he reversed his decision upon reconsideration and admitted this count on the ground that Maurer can make it."

Very elaborate briefs have been filed by both parties in connection with the cross-appeal and these have received our careful attention. After our study of the case in the light of the briefs supplied, we find no reason which, in our opinion, would justify a reversal of the board's decision. It is our view that the Primary Examiner was right in his first holding, and the decision of the board strengthens our conviction in that regard. Since we agree with the board's decision for the reasons assigned by it, it is not deemed necessary to discuss the numerous arguments pro and con respecting the highly technical matters embraced in the briefs.

The decision of the Board of Interference Examiners awarding priority to the joint inventors, Simpson and Carnagua, as to count 7 is affirmed.

Affirmed.